# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### Criminal No. 13-00273 (SRN/FLN)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MORAN OZ (2);** | ) | **ORDER** |
| **LACHLAN SCOTT MCCONNELL (6);** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

Jacqueline Blaesi-Freed, Linda I. Marks, U.S. Department of Justice, Consumer Protection Branch, 450 5th St. NW, Ste. 6400, Washington, DC 20001, and Roger J. Gural, U.S. Department of Justice, Civil Division, P.O. Box 386, Washington, DC 20044, for the United States of America.

Joseph S. Friedberg, Joseph S. Friedberg, Chartered, 701 4th Ave. S., Ste. 300, Minneapolis, MN 55415, Robert D. Richman, P.O. Box 16643, St. Louis Park, MN 55416, for Defendant Moran Oz.

Marie Celine Pacyga and Ryan M. Pacyga, Pacyga and Associates, PA, 333 South Seventh St., Ste. 2850, Minneapolis, MN 55402, for Defendant Lachlan Scott McConnell.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Government's Motion in Limine to Exclude Evidence of Duress and Evidence Relating to Paul Le Roux ("Gov't Mot.") [Doc. No. 690]. For the reasons set forth below, that Motion is denied.

## I.      BACKGROUND

In response to the Government's Motion, the Court previously ordered that Defendants Moran Oz ("Oz") and Lachlan Scott McConnell ("McConnell") participate in a pretrial proffer related to their anticipated duress defenses.  (See Order dated 1/4/2017 ("January 4 Order") [Doc. No. 756].)   The Court incorporates that previous order by reference here.

Oz and McConnell are charged with various offenses related to their alleged involvement in unlawfully distributing prescription drugs over the Internet through an organization known as RX Limited ("RXL").  (Id. at 2.)  The Government alleges that the RXL conspiracy, in relevant part, ran from 2004 through 2012.  (See Indict. at 7.)

According to Oz and McConnell, Paul Le Roux ("Le Roux")—who is not a defendant in this case—is a "billionaire global criminal mastermind" who allegedly ran a multi-faceted international criminal enterprise that included RXL.  (January 4 Order at 2.)  At a prior hearing in this case, Le Roux admitted to committing the murders of at least six foreign nationals in other countries, trafficking drugs internationally, arming a "private security team" in Somalia, sending arms to the Philippines, and hatching a plan to sell fertilizer, which could be used to make explosives, and chemicals necessary to manufacture methamphetamines.  (Id.)  In 2014, Le Roux pled guilty in the Southern District of New York to various charges, including: (1) conspiracy to import drugs, (2) exporting prohibited technology to Iran (and, as part of that offense, participating in or causing six murders and soliciting a seventh), (3) computer hacking, (4) assisting an offender by paying a foreign official to impede the offender's extradition to the United

States, and (5) offenses related to RXL including misbranding, mail and wire fraud, and conspiracy to commit money laundering.  (Id. at 2–3.)  Le Roux is awaiting sentencing on these charges.  (Id. at 3.)

Pursuant to the Government's request—and because relevant case law supported it—the Court ordered that Oz and McConnell make pretrial proffers so that it might assess whether each Defendant could support a prima facie case of duress.  (Id. at 7–11, 16.)  On January 13, 2017, counsel for Oz and McConnell made proffers regarding the evidence they anticipated eliciting at trial in support of their duress defenses.  (See Hr'g Tr. dated 1/13/2017 ("Hr'g Tr.") [Doc. No. 774].)  Counsel later supplemented these proffers with additional information.  (See Def. Oz's Supplement to Proffer on Duress ("Oz's Supplemental Proffer") [Doc. No. 773], Def. Oz's Mem. in Supp. of Duress Defense ("Oz's Mem. in Supp.") at 5–9 [Doc. No. 792], Def. McConnell's Resp. in Supp. of Defendant's Use of Coercion and Duress Evidence at Trial ("McConnell's Resp. in Supp.") at 2–5 [Doc. No. 794].)

The Court summarizes the Defendants' proffers below.  At this juncture, the Court will not evaluate the credibility of the evidence and the Court will view the evidence in the light most favorable to Defendants."  See United States v. Capozzi, 723 F.3d 720, 725 (6th Cir. 2013) ("To establish a prima facie case, the defendant must present *some* evidence that *could* support each [element of duress]." (emphasis added)); United States v. Bailey, 444 U.S. 394, 415 (1980) ("[P]recisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a *minimum standard* as to

3

each element of the defense so that, *if a jury finds it to be true*, it would support an affirmative defense–here that of duress or necessity." (emphasis added)).

### A. Oz and Le Roux

Oz, an Israeli citizen, joined an internet pharmacy company based in and incorporated under the laws of Israel in 2005. (Hr'g Tr. at 6–7.) This company was not immediately identifiable as part of RXL and appeared to Oz to be a legitimate, legal enterprise like many other online pharmacies he was familiar with in Israeli and elsewhere. (Hr'g Tr. at 6–7.) Oz's job was to manage call centers and direct the logistics of delivering prescription drugs purchased through websites. (Hr'g Tr. at 6–7.) Oz was initially unaware of Le Roux's involvement with this company. (Hr'g Tr. at 7.)

In 2008, Le Roux invited Oz to the Philippines on multiple occasions. (Hr'g Tr. at 8.) During these meetings, Le Roux complimented Oz on his performance and explained more about Le Roux's role in RXL (i.e., he was the owner/boss of the company and its many affiliates), the structure of RXL, the Israeli company's status as an affiliate of RXL, and why RXL was based out of the Philippines (e.g., cheaper labor and lower taxes). (Hr'g Tr. at 8–9.) Nothing in these meetings suggested that RXL was an illegitimate company or that Le Roux was a dangerous individual. (See Hr'g Tr. at 8–9.)

In early 2009, Le Roux again summoned Oz to the Philippines—ostensibly to discuss relocating the Israeli affiliate to the Philippines. (Hr'g Tr. at 9.) Le Roux had Oz board a boat under the guise of going to check out a potential location on another island. (Id. at 9–10.) On this boat were three individuals Le Roux described as his "Brazilian business partners." (Id.) However, once the boat was in open water, these three

individuals threw Oz into the ocean.  (<u>Id.</u> at 10.)  The boat turned back and began to circle Oz while one of the Brazilians pointed a gun at him and another accused him of being disloyal to Le Roux, stealing from the company, and operating a competing online pharmacy.  (<u>Id.</u> at 10–11.)  The Brazilian holding the gun would occasionally shoot into the water close to Oz.  (<u>Id.</u> at 11.)

Oz denied the Brazilians' accusations and could hear and see them communicating with Le Roux via a cellphone.  (<u>Id.</u> at 11.)  The Brazilians then offered Oz a "choice"— he could confess to being disloyal and he would be shot to death, or he could continue to deny it, in which case he would be shot, but merely wounded, and left for the sharks. (<u>Id.</u>)  Oz continued to deny any disloyalty, at which point the Brazilians suggested to Le Roux that he might be telling the truth.  (<u>Id.</u>)  Oz was then hauled back onto the boat, tranquilized, and kept onboard for approximately another day.  (<u>Id.</u>)  As the boat approached the shore, one of Le Roux's associates, Dave Smith, told Oz that Le Roux's organization "is like an octopus" with "tentacles all over the world" that could reach Oz or his family anywhere and punish them if Oz were disloyal to Le Roux.  (<u>Id.</u> at 12.)

Back on shore, Le Roux picked up Oz and "apologized" for what had just happened.  (<u>Id.</u>)  However, he reiterated that he would not tolerate any disloyalty from Oz and expected Oz to do as he was told.  (<u>Id.</u>)  Le Roux also explained that the internet pharmacy business was his "bread and butter" and thus it was critical that it "work efficiently" and Oz had better not give Le Roux reason to doubt him.  (<u>Id.</u> at 12–13.)  Oz now believes that Le Roux became suspicious because Oz spoke with an Israeli associate, Levi Kugel, about buying a "brick-and-mortar" pharmacy which they would then use to

fill prescriptions for RXL.  (Id. at 13.)  Oz believes Kugel reported this conversation to
Le Roux, demonstrating that Le Roux had a wide-reaching network of informants that
included some working in Israel.  (Id.)

Oz immediately fled the Philippines and returned to Israel.   (Id. at 13–14.)
Another associate of his told Oz not to contact the Filipino police about what had
happened because Le Roux "owned" that police force.  (Id. at 14.)  This comported with
statements Le Roux made earlier to Oz about how he had a "very friendly relationship"
with the police in the Philippines.   (Id. at 15.)   Oz believed he could not tell Israeli
authorities about what had happened because no crime had been committed in Israel.  (Id.
at 16.)  Moreover, Oz was now "petrified" of Le Roux and believed that Le Roux was
capable of harming him and his family in Israel by employing Le Roux's connections
with certain Israeli "gangsters."  (Id.)

Over the next several months, Oz continued to "stay loyal" to Le Roux by
operating the logistics center in Israel.  (Id.)  However, Oz did try and protect himself by
installing a security system in his home, buying weapons, and changing up his daily
routines.  (Id.)  He also hired a private investigator, but this investigator advised him that
he "couldn't be protected."  (Id.)

For the next several years, there was a "constant flow" of Le Roux's associates
coming to Israel and monitoring the activities of Oz and others at the Israeli company.
(Id. at 16–17.)   Although these "henchmen" were not always present, they appeared
"intermittently."  (Id.)  Oz also learned that Le Roux had a "partner"—Ben Menashe—
who was allegedly part of Israel's intelligence services.  (Id. at 17–18.)  Menashe would

appear from time to time at the company and was a "frightening" "ghost-like" figure. (Id.)  In fact, Kugel allegedly told Oz that he had paid a considerable sum of money to Menashe on Le Roux's behalf in an attempt to get Le Roux a diplomatic passport.  (Id. at 18.)  However, Menashe stole the money instead and Kugel fled the country because he believed Le Roux would hold him responsible and kill him.  (Id.)  In 2009, Le Roux also called Oz and told him that if another associate—Alon Berkman, who is a Defendant in this case—did not answer Le Roux's calls, Le Roux would cut off Berkman's hands and tongue.  (Id. at 20.)

Oz is similarly prepared to testify that after the 2009 incident in the Philippines and continuing through 2012, he heard many other accounts of Le Roux's ruthlessness, paranoia, and seemingly substantial connections with various government agencies and criminal organizations around the world.[1]  (See Hr'g Tr. at 20–26, 29–30.)  Moreover, Le Roux repeatedly "reminded" Oz that if Oz did not do as Le Roux instructed, tried to leave Le Roux's employ, or if he were otherwise disloyal, Oz would be "going back in the water."  (Id. at 25.)  Even when Le Roux seemingly "disappeared" for a time in 2011, his henchmen were present in Israel and/or regularly called Oz and others to remind them to continue doing as Le Roux had ordered.  (Id. at 26.)

---

[1] Oz plans to introduce the evidence about what he heard from others through his own testimony, but argues that it is not hearsay because he does not offer it for the truth of the matter asserted.  Further, Oz argues that this testimony is admissible to evaluate "the effect on the listener" and Oz's state of mind.  (Hr'g Tr. at 18–19, 23, 30–31.)  In his supplemental briefing on this subject, Oz made clear he intends to corroborate much of his own testimony with that of Le Roux himself and also Joseph Hunter, who was one of Le Roux's henchmen and was present on the boat in 2009 when Oz was thrown overboard.  (See Oz's Supplemental Proffer.)

In 2012, Le Roux contacted Oz and suggested that they meet so that he could give Oz money to pay the employees of the Israeli logistics company.[2]  (Id. at 28.)  Oz was "feeling pressure" to meet with Le Roux so that Oz's employees could be paid.  (Id.)  Oz agreed to meet Le Roux, but suggested Romania as a location.  (Id.)  Oz suggested this location because he had a contact who would arrange for bodyguards to accompany Oz to the meeting.  (Id.)  Oz in fact hired the bodyguards, who escorted him to the meeting location, where Oz was ultimately arrested by Romanian authorities and extradited to the United States.  (See id.)

During the proffer, counsel for Oz stressed that at no time did he believe the work he was doing was illegal.  (Id. at 28–29.)  However, he wanted to leave the company after the 2009 incident in the Philippines.  (Id. at 29.)  Oz continued working for Le Roux only because he believed that Le Roux could and would harm him and his family if he were to leave the company.  (Id.)

## B. McConnell and Le Roux

McConnell is a Canadian citizen and has worked as a private security contractor for many years.  (See Indict. at 4.)  In 2008, McConnell learned—through a former business partner, Dave Smith—that there was a "wealthy business man in need of security . . . ."  (Hr'g Tr. at 32.)  Smith introduced McConnell to Le Roux.  (Id.) McConnell learned from Le Roux that he had a number of businesses—such as gold mining and trading, timber harvesting, lobster farms, international shipping, gun clubs,

---

[2] Unbeknownst to Oz at the time, Le Roux had been captured by United States authorities and was assisting them in investigating RXL.  (Hr'g Tr. at 27.)

night clubs, and call centers—spread around the world, many of which were located in unstable areas like the Congo, Somalia, and Zimbabwe.  (Id. at 33.)  Le Roux also informed McConnell that he "demanded secrecy in his business, and anonymity."  (Id.) McConnell agreed to work for Le Roux in a part-time capacity, with his initial duties being to oversee construction of a gun club in the Philippines and to offer Le Roux "general security consulting" services.  (Id. at 32–33.)  However, McConnell's job duties quickly expanded to include activities like transporting gold bars around the world.  (Id. at 34.)  While working for Le Roux, McConnell became aware that he was "eminently wealthy," with numerous properties, connections, and holdings around the world.  (Id. at 33–34.)

In August of 2008, McConnell went with Smith to Zimbabwe to pick up and transport gold on Le Roux's behalf.  (Id. at 34.)  Upon arriving, they met with Joseph Hunter—who also worked for Le Roux—as well as one of Le Roux's nephews and "some other business partners."  (Id. at 34–35.)  Ultimately, Le Roux decided there was a "problem" or "scam" going on and asked that McConnell provide him with the address where one of the business partners was staying.  (Id. at 35–36.)  McConnell would later learn that Le Roux used this information when he ordered Hunter to firebomb and shoot at the house where the business partner was staying.  (Id. at 34–36.)

Also in 2008, Le Roux sent McConnell to Canada to track down one of his business partners.  (Id. at 37.)  Le Roux provided McConnell with pictures of the business partner and an address.  (Id.)  At the time, McConnell "didn't think anything of it[,]" but later came to suspect this was part of Le Roux's "MO [modus operandi]" of sending

people to locate individuals Le Roux believed had wronged him so that he might threaten or harm them.[3]  (See id. at 37–38.)

McConnell was also informed—by Smith—of the incident wherein Oz was thrown overboard shortly after it happened.  (Id. at 38.)  In 2010, McConnell was made aware that Le Roux had ordered the murder of a boat captain—Bruce Jones—who was captured by Filipino authorities while transporting a shipment of guns on Le Roux's behalf.  (Id. at 40.)  Jones was in fact killed and Le Roux later admitted to McConnell he had arranged for the murder.  (Id.)  From 2009 through 2010, Le Roux would send various associates to McConnell's residence in the Philippines (where he resided with his family) to "carry out business activities" and even ordered Smith to park outside McConnell's residence on occasion to show McConnell that Le Roux was watching him. (Id. at 49.)

Based on what he learned about Le Roux's organization and Le Roux's violent tendencies, McConnell began to question the legality of Le Roux's operations and wanted to leave Le Roux's employ in 2010.  (See id. at 44.)  However, he was scared to do so because of Le Roux's proven ability to have people killed when he perceived that they had crossed him.  (See id.)  In August of 2010, Smith approached McConnell and explained that he had been "borrowing" gold from Le Roux, but that it was fine because he would pay Le Roux back.  (Id. at 41.)  Smith offered to give some of the gold to McConnell so that McConnell could start his own business, which McConnell planned to

---

[3] It is presently unclear whether any harm befell this Canadian business partner.  (Hr'g Tr. at 38.)

use as a means to separate himself from Le Roux.  (Id.)  McConnell accepted and Smith provided him with some gold.  (Id. at 41–42.)  Shortly thereafter, "word started spreading" that Smith had disappeared and people within Le Roux's organization theorized it was because Smith stole gold from Le Roux.  (Id. at 42.)  Le Roux ultimately called for an audit of his gold in January of 2011, after which he summoned McConnell to one of Le Roux's bars located in an isolated area of the Philippines.  (Id.)

At this meeting, Le Roux accused McConnell of stealing gold from him with Smith and explained that this sort of disloyalty would not be tolerated.  (Id.)  Le Roux admitted to having Smith killed and threatened McConnell's life, but explained that Smith was "expendable" whereas McConnell was "necessary" to Le Roux's organization at the moment.  (Id. at 42–44.)  Le Roux demanded that McConnell pay him back by working at a reduced rate to assist Le Roux's online pharmacy businesses in the United States.  (Id. at 43.)

In early 2011, McConnell arrived in the United States and began supporting other Le Roux associates with operating RXL's pharmacy business.  (Id. at 46–47.)  Later in 2011, McConnell asked Le Roux to excuse him from his duties for mental health reasons. (Id. at 47–48.)  McConnell was suffering from depression and anxiety related to his work and believed these health issues might offer him the chance to break away from Le Roux. (See id. at 47–49.)  Le Roux allowed McConnell to leave the United States and seek treatment in the Philippines, but explained that he expected McConnell to quickly return to work.  (Id. at 48–49.)  McConnell returned to the Philippines and sought treatment at a hospital, but also took steps to hide from Le Roux by moving his family on multiple

occasions and hiring individuals to watch for people who might be following him or his family.  (Id. at 48–50.)  Ultimately, McConnell managed to leave Le Roux's organization in 2012.[4]  (Id. at 50–51.)

Once McConnell was free of Le Roux, he began researching Le Roux and came to understand "more of the full nature of what's been going on . . . ."  (Id. at 51.)  Concerned about Le Roux's influence with the Filipino police, McConnell gathered what he knew and presented it to the United States Embassy in the Philippines in 2013.  (Id. at 51–53.)  McConnell was ultimately arrested and extradited to the United States.

## II.  DISCUSSION

### A.  Legal Standard

To succeed on a duress defense, a defendant must prove that:

(1) he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to commit a criminal act; (3) that he had no reasonable, legal alternative to violating the law; and (4) that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm.

United States v. Diaz, 736 F.3d 1143, 1150 (8th Cir. 2013) (quoting United States v. Gamboa, 439 F.3d 796, 816 (8th Cir. 2006)).  As this Court previously held, a pretrial proffer on the anticipated duress defenses was necessary so that the Court could assess the admissibility of Oz and McConnell (collectively, "Defendants") evidence and

---

[4] McConnell was unaware of Le Roux's arrest at the time of his departure.  (Hr'g Tr. at 52.)

determine whether they met the required prima facie showing as to each element of duress.  (See January 4 Order at 9–11.)

The Government acknowledges that "the bar is low for making a prima facie showing" of duress, but argues that "the standards for duress are 'rigorous' and difficult to achieve."  (Gov't's Mem. Regarding the Admissibility of Defs.' Proffered Duress Evid. ("Gov't's Mem.") at 2 [Doc. No. 781] (quoting United States v. Pestana, 865 F. Supp. 2d 357, 367 (S.D.N.Y. 2011)).)  In fact, the crux of the Government's argument is that Defendants failed to satisfy this "rigorous" standard.  (See id. ("In the face of these rigorous standards, defendants Oz and McConnell did not meet their burden as to the first three elements of duress.").)  In essence, the Government contends that Defendants' proffers are not credible and thus they should be precluded from offering duress-related evidence at trial.  (See generally Gov't's Mem.)

The Government's "rigorous" standard and credibility arguments miss the mark. The issue before the Court is whether Defendants should be precluded from putting on a duress defense *as a matter of law*.  As this Court previously held, Defendants' evidentiary burden at this pretrial stage is minimal and the Court must assume the proffered evidence is true.  (January 4 Order at 11–12.)  To the extent the Government contends that the "rigorous" standard allows the Court to make pretrial credibility determinations about Defendants' proffered evidence, the Court disagrees.  See Pestana, 865 F. Supp. 2d at 366 (noting that when deciding whether to exclude a duress defense pretrial, the proffered evidence must be taken in the light most favorable to the defendant).

13

The Government is free to argue, at the close of evidence, that the jury should not be instructed as to duress because Defendants failed to present sufficient evidence in support of that defense, or because no reasonable juror could believe the evidence that was presented.  See United States v. Hudson, 414 F.3d 931, 933 (8th Cir. 2005) ("We have said that a defendant is entitled to a jury instruction concerning an available justification defense if she shows an underlying evidentiary foundation as to each element of the defense, regardless of how weak, inconsistent or dubious the evidence on a given point may seem.  We have never held, however, that a defense must be submitted to the jury even when it cannot be said that a reasonable person might conclude the evidence supports the defendant's position." (quotations and citations omitted)).   However, the evidentiary standard at this pretrial juncture is more accommodating to Defendants.  See United States v. Ridner, 512 F.3d 846, 849 (6th Cir. 2008) ("The defendant's preliminary burden is not a heavy one and is met even where there is weak supporting evidence." (quotations omitted)); Capozzi, 723 F.3d at 725; Bailey, 444 U.S. at 415.

### B.  Present, Imminent, and Impending Threat

The Government argues that Defendants fail to establish that Le Roux's threats were present, imminent and impending.  (Gov't Mem. at 2–6 [Doc. No. 781].)  The Government contends that Le Roux's single, direct threat to each Defendant (i.e., for Oz, the 2009 incident in the ocean off the Philippines and for McConnell, the 2011 meeting with Le Roux at the bar in the Philippines) were not temporally "immediate" to the crimes Defendants allegedly later committed as part of their work for RXL.  (Id. at 4.)

Moreover, the Government questions the credibility of Defendants' "vague allegations" that Le Roux was having them watched, followed, and intimidated.  (See id. 4–6.)

"[G]eneralized fears are insufficient to establish an imminent threat of harm; rather, a defendant must show that a real and specific threat existed."  United States v. Bonilla-Siciliano, 643 F.3d 589, 591 (8th Cir. 2011).  For instance, generalized fears about the persecution one might face in his country of origin from the government or gang members are not specific enough.  Id.  Conversely, testimony that a defendant was threatened and beaten for not doing as she was told on earlier occasions does satisfy the pretrial prima facie standard.  United States v. Ceballos, 593 F. Supp. 2d 1054, 1060–61 (S.D. Iowa 2009); see United States v. Ruiz-Celaya, No. CR1501160003PHXNVW, __ F. Supp. 3d __, 2016 WL 5682835, at *3 (D. Ariz. Sept. 30, 2016) (defendant's assertion that members of her arrested husband's cartel threatened her and her family if she did not comply with their demand that she purchase a weapon were specific and satisfied the pretrial prima facie standard).

Furthermore, the threat a defendant faces must be "immediate" in the sense that it must occur in close temporal proximity to the subsequent bad acts that the defendant engages in because of the threat.  United States v. Morales, 684 F.3d 749, 756 (8th Cir. 2012).  However, where a defendant's persecutor evidences the ability to easily "reach" the defendant—e.g., the defendant is being monitored or watched by those who threatened him—a threat may be immediate to crimes committed by the defendant in the future because the ability to quickly "make good" on the threat remains.  See United States v. Chi Tong Kuok, 671 F.3d 931, 948 (9th Cir. 2012) (persecutor's threat was

immediate because it was specific and persecutor demonstrated ability to locate and monitor defendant's family); United States v. Contento-Pachon, 723 F.2d 691, 694 (9th Cir. 1984) ("[The defendant] contends that he was being watched by one of [his persecutor's] accomplices at all times during the airplane trip.  As a consequence, the force of the threats continued to restrain him."); Ruiz-Celaya, 2016 WL 5682835 at *1, 3–4 (D. Ariz. Sept. 30, 2016) (a persecutor's threat was immediate where persecutor showed an ability to locate and confront defendant and her family and had the defendant monitored until she made the demanded weapons purchase, even though that purchase took place days after the initial threat); see also Ceballos, 593 F. Supp. 2d at 1060–61 (persecutor's history of domestic violence against the defendant when she refused his demands "tend[ed] to establish the objective seriousness and constant immediacy of the threat [the persecutor] posed").

Chi Tong Kuok and Contento-Pachon bear close factual similarities to the present matter.  In Chi Tong Kuok, the defendant ("Kuok") was convicted of various counts— including conspiracy charges—related to his attempts to import defense articles to China. 671 F.3d at 934.  Kuok's efforts to import defense articles from the United States to China spanned nearly a decade, from 2000 until his arrest in 2009.  Id.  Kuok was a citizen of Macau, a special administrative region of China.  Id.  In 2000, he started a business in Macau installing and maintaining building management systems.  Id. at 935. As part of this business, he developed contacts with an individual who identified himself as a Chinese cultural official ("Zheng").  Id.  Zheng asked that Kuok assist him in purchasing items from abroad that could not be found in China and Kuok initially agreed

in an effort to foster this business relationship.  Id.  However, Kuok's relationship with Zheng "turned serious" during a business dinner where, after encouraging Kuok to drink too much, Zheng pressured Kuok into signing a contract wherein Kuok agreed to purchase particular items that could not be obtained in China.  Id. at 935–36.

The next day, Kuok tried to back out of the agreement, claiming that his wife was ill.  Id. at 936.  Zheng, without asking Kuok, called Kuok's wife and learned that she was not ill.  Id.  When Kuok confronted Zheng about this call and requested that Zheng not call his wife again, Zheng asked, "Why?  Are you afraid we're going to hurt her?"  Id.  Kuok took this as a clear threat that Zheng was prepared to harm his family.  Id.  He did not believe he could go to the authorities for help because Zheng worked for the Chinese government.  Id.

Kuok's situation "only escalated from there[,]" with Zheng presenting reports and other information that indicated Kuok and his family were being monitored.  Id.  In 2002, Zheng "stopped being subtle" and told Kuok that if he did not continue to import the devices Zheng requested, Kuok's wife would be arrested and held in a "black jail."  Id.  Kuok first suspected his importations might violate United States' export laws in 2005 and again asked to be released by Zheng.  Id.  Zheng refused and said that Kuok had no choice but to continue.  Id.  In 2007, Kuok was diagnosed with a tumor and hospitalized for a week, at which point he again begged to be released from Zheng's scheme, but Zheng refused.  Id.  At some point during this ordeal, Kuok developed a suspicion that Zheng and the other officials who "handled" Kuok actually worked for Chinese intelligence agencies.  Id.  Kuok was ultimately arrested when he stopped in the United

States on a layover in 2009. Id. at 935. Kuok claimed that when he was arrested, he tried to tell the agents that he had been forced to act as he had. Id. at 936.

At trial, Kuok attempted to raise a duress defense, but the government objected—arguing that there was insufficient evidence to support such a defense. Id. Despite Kuok's proffer of the information described above, the district court granted the government's motion and prevented Kuok from putting on his duress defense at trial. Id. Kuok was convicted on all counts and appealed. Id. at 936–37.

On appeal, the Ninth Circuit held that "[t]he threat to Kuok's family was both immediate and serious." Id. at 947. The Court equated specificity with immediacy, holding that "to be immediate, a threat must be specific[.]" Id. Zheng's threats were specific—e.g., Kuok's wife would be arrested and sent to a "black jail"—and thus immediate. Id. Moreover, the fact that Zheng had Kuok and his family closely monitored meant that his specific threats remained immediate even years after they were made. See id. at 947–48. Ultimately, the Ninth Circuit held that the district court committed reversible error by preventing Kuok from presenting his duress defense at trial. Id. at 950.

In Contento-Pachon, the defendant ("Contento-Pachon") was convicted of possession with intent to distribute a controlled substance. 723 F.2d at 692. Contento-Pachon was a citizen of Colombia who worked as a cab driver in Bogota. Id. at 693. One day, a passenger ("Jorge") asked if Contento-Pachon would like a job as a private driver. Id. Contento-Pachon agreed to meet with Jorge and the owner of this private car. Id. At that meeting, Jorge instead proposed that Contento-Pachon swallow cocaine-filled

balloons and transfer them to the United States.  Id.  Contento-Pachon agreed to consider the idea, but ultimately decided against it and told Jorge as much approximately a week later.  Id.  Contento-Pachon did not go to the police because he believed that they were corrupt and likely paid off by the drug traffickers.  Id.

When Contento-Pachon turned down Jorge's "offer," Jorge mentioned numerous facts about Contento-Pachon's personal life and his family which Contento-Pachon had never told him.  Id.  Jorge said that if Contento-Pachon did not cooperate, Contento-Pachon's wife and child would be killed.  Id.  Believing his life and the lives of his family were in danger, Contento-Pachon agreed to be a drug mule.  Id.

After a few more meetings, Contento-Pachon ultimately swallowed over 100 balloons filled with cocaine and boarded a plane for the United States.  Id.  He was told that he would be watched at all times during the trips and if he deviated from the plan, his family would be killed.  Id.  Contento-Pachon's plane stopped over in Panama, but Contento-Pachon did not notify the authorities there because he worried about his family back in Colombia and also believed the Panamanian authorities were corrupt.  Id.  Ultimately, Contento-Pachon landed in the United States where he agreed to have his stomach x-rayed, the balloons were discovered, and he was arrested.  Id.  At the subsequent trial, the government's motion to exclude a duress defense was granted, Contento-Pachon was convicted, and he appealed.  Id.

The Ninth Circuit rejected the district court's conclusion that the threats to Contento-Pachon were not immediate.  Id. at 694.  It held that:

> Evidence presented on this issue indicated that the defendant was dealing with a man who was deeply involved in the exportation of illegal substances.   Large sums of money were at stake and, consequently, Contento-Pachon had reason to believe that Jorge would carry out his threats.   Jorge had gone to the trouble to discover that Contento-Pachon was married, that he had a child, the names of his wife and child, and the location of his residence.   These were not vague threats of possible future harm.   According to the defendant, if he had refused to cooperate, the consequences would have been immediate and harsh.
>
> Contento-Pachon contends that he was being watched by one of Jorge's accomplices at all times during the airplane trip.   As a consequence, the force of the threats continued to restrain him.

Id.   The Ninth Circuit reversed and remanded with instructions that Contento-Pachon be allowed to present his duress defense to a jury and for the jury to weigh the credibility of that defense.   Id. at 695.

Here, Oz and McConnell have described in vivid detail the specific threats Le Roux leveled at them—cross or otherwise be "disloyal" to Le Roux (i.e., stop doing as Le Roux instructed or leave his employ) and they and/or their families would be physically harmed.   Le Roux, a wealthy individual engaged in a myriad of serious and often violent crimes around the world, demonstrated his ability to locate and monitor the Defendants—through his network of corrupted government officials and henchmen—to ensure they complied with his edicts.   Had Defendants disobeyed, "follow through" on Le Roux's threats would be swift and deadly, as Le Roux's punishment of others who crossed him plainly showed.   At a minimum, Defendants have made the required pretrial prima facie showing as to the immediacy of the threats they faced.

Many of the Government's objections to the proffered duress defenses consist of arguments that Defendants' stories are simply unbelievable, or that Defendants

unreasonably interpreted or assessed the threats they faced.  (See Gov't Mem. at 4–6.) But these are credibility arguments for the jury to resolve, not bases on which to preemptively deny Defendants the opportunity to present their defenses.  See Chi Tong Kuok, 671 F.3d at 950 ("In short, the ultimate factfinders may or may not accept Kuok's story, but he has alleged facts sufficient to present his defense to the jury."); Contento–Pachon 723 F.2d at 694 ("Contento-Pachon's contention that he was operating under the threat of immediate harm was supported by sufficient evidence to present a triable issue of fact."); Ruiz-Celaya, 2016 WL 5682835 at *3 (whether or not the defendant's duress evidence was credible was a fact issue for the jury).

### C. Reckless or Negligent Placement Within Le Roux's Organization

The Government argues that despite the Defendants' awareness of Le Roux's criminal behavior, they recklessly or negligently decided to work for him nonetheless. (Gov't Mem. at 6–7.)  For instance, the Government notes that even before Le Roux's specific threat to McConnell in 2011, McConnell had reason to know Le Roux was engaged in "dubious, if not criminal, enterprises[,]" and yet he still agreed to assist with RXL and took gold that he knew belonged to Le Roux.  (Id.)  Similarly, the Government contends that Oz was "at least negligent" because he worked for RXL from 2005 until 2009 without ever substantively questioning whether that business complied with relevant laws.  (Id. at 7.)

The Government's arguments miss the point.  Defendants both contend that they did not understand or appreciate the extent of Le Roux's criminal conduct when they initially agreed to work for him.  Oz avers that when he first joined the Israeli company,

21

he had no idea who Le Roux was—or that Le Roux was even involved in the business—
and that he never believed that the online pharmacy business ran afoul of the law because
that business had all the "trappings" of a legitimate operation (e.g., corporate registration,
paid taxes, similar structure to other online pharmacies, efforts to avoid dispensing
controlled substances, etc.).   McConnell similarly understood Le Roux to be a
"legitimate" business man whose businesses happened to be situated in unstable parts of
the world (necessitating the need for someone with McConnell's security background).
(See McConnell's Resp. in Supp. at 4 n.3.)   Le Roux was not a world-renowned crime
boss—like Joapuin "El Chapo" Guzman, James "Whitey" Bulger, or John Gotti—who
any reasonable person would know to avoid.   It was only after Defendants were
entangled in Le Roux's "web" that they became aware of the criminal nature of the
enterprise and Le Roux's violent tendencies.   By then they argue, it was too late and they
could not escape without incurring Le Roux's wrath.

The Government is free to argue to the jury that Defendants' stories are not to be
believed and that they recklessly or negligently placed themselves into Le Roux's
criminal empire.   But again, it is for the jury to decide what evidence is credible.   See
Ceballos, 593 F. Supp. 2d at 1063 ("The Government attempts to [argue that] it was at
least negligent or reckless for Defendant to remain with [her persecutor] after his first
request for her to translate [a drug transaction], which would preclude a duress defense
for Defendant's second translation a week later.   However, the Court cannot conclude
this as a matter of law because of [the persecutor's] ongoing threat of violence should
Defendant refuse his requests or attempt to leave.").   Defendants have met their burden to

establish a prima facie case that they did not recklessly or negligently place themselves into a situation where it was probable that they would be forced into criminal acts.

### D.  No Reasonable, Legal Alterative

The Government argues that Defendants had reasonable, legal alternatives to going along with Le Roux's demands.  (See Gov't's Mem. at 7–9.)  Specifically, the Government disputes the idea that Defendants did not have the opportunity to contact the appropriate authorities and extricate themselves from Le Roux's operation.  (See id. at 8–9.)

The third element of a duress defense requires that a defendant have no "reasonable, legal alternative to violating the law," and not have had the chance to refuse to do the criminal act demanded while avoiding the threatened harm.  Hudson, 414 F.3d at 934.  Generally, this element is not met if the defendant had the opportunity to seek the assistance of "responsible law enforcement authorities."  See id.  "[A] defendant's subjective belief that going to law enforcement would prove futile is insufficient to meet the objective standard that there was no reasonable, legal alternative to violating the law." United States v. Harper, 466 F.3d 634, 648 (8th Cir. 2006).  However, "the inability to seek help from the local police is a relevant factor in assessing the opportunity to escape." Chi Tong Kuok, 671 F.3d at 949; see Contento-Pachon, 723 F.2d at 694.  Similarly, if a defendant had the opportunity to "disengage" with the criminal activity (i.e., flee), but did not take that chance, he cannot later claim duress.  See Harper, 466 F.3d at 648. However, "the opportunity to escape must be reasonable."  Contento-Pachon, 723 F.2d at 694.  Overall, "the critical question is whether [a defendant's] belief [about his ability to

flee or go to the authorities] was objectively reasonable taking into account [his] particular circumstances." United States v. Nwoye, 663 F.3d 460, 464 (D.C. Cir. 2011).

Defendants have made the necessary prima facie showing that they did not have a reasonable opportunity to flee from Le Roux or report him to the appropriate authorities. Defendants were—to varying degrees—aware of Le Roux's considerable influence with the local authorities (e.g., Israeli and Filipino) and thus doubted those agencies' ability to protect them or their families. See Chi Tong Kuok, 671 F.3d at 949 ("[A] jury should decide whether Kuok, who claims the government itself was threatening him, could not seek aid from local authorities."); Contento-Pachon, 723 F.2d at 694 (reasonableness of defendant's beliefs about corruption of local authorities was for jury to assess); Ruiz-Celaya, 2016 WL 5682835 at *4 (defendant's beliefs about the corruption of Mexican authorities satisfied pretrial prima facie showing requirement). Defendants were similarly skeptical of a foreign government's (e.g. the United States') ability to protect them from the far-reaching "tentacles" of Le Roux's operation, which were monitoring them and their families. See Chi Tong Kuok, 671 F.3d at 949; Ruiz-Celaya, 2016 WL 5682835 at *4. Furthermore, attempting to flee somewhere outside Le Roux's global reach—with their families—was not necessarily reasonable. See Chi Tong Kuok, 671 F.3d at 949 ("[T]he possibility of packing up and moving out of the dangerous environment, abandoning one's work and displacing one's entire family, does not necessarily present a reasonable opportunity for escape."); Contento-Pachon, 723 F.2d at 694 ("To flee, Contento-Pachon, along with his wife and three year-old child, would have been forced to pack his possessions, leave his job, and travel to a place beyond the

reaches of the drug traffickers.  A juror might find that this was not a reasonable avenue of escape.").

### E.  Direct, Causal Relationship

"In the interest of brevity," the Government did not address the fourth element of duress, but explicitly did not concede that Defendants met their pretrial prima facie burden as to this element.  (Gov't Mem. at 2 n.2.)  However, the Court finds that Defendants satisfied their burden.

The fourth and final element of duress requires "that a direct causal relationship may be reasonably anticipated between the commission of the criminal act and the avoidance of the threatened harm."  Diaz, 736 F.3d at 1150.  Here, Defendants proffered that Le Roux and his associates made it abundantly clear that there was only one way to avoid being killed or harm—continue loyally working for Le Roux and assisting with the "bread and butter" of his empire, RXL.  Oz was a crucial part of the daily operations of RXL.  Le Roux specifically told McConnell that he would be killed if he did not go to the United States to assist RXL's operations there.  Thus, to the extent Defendants' acts in furtherance of RXL were illegal, at least some were done to avoid the harm Le Roux threatened.

### F.  Admissibility Arguments

Notably, the Government's arguments about the admissibility of Defendants' proffered duress evidence consist of just a few sentences located in two footnotes.  (See Gov't Mem. at 1 n.1, 3 n.3.)  First, the Government contends much of this evidence is hearsay, with some of it containing multiple layers of hearsay.  (Id. at 1 n.1.)  Second, the

Government argues that Defendants' accounts "needlessly present cumulative evidence . . . ." (Id.)  Third, the Government asks that the Court "exclude as irrelevant" all evidence of Le Roux's and Hunter's bad acts of which Defendants were unaware "during the course of the conspiracy." (Id. at 3 n.3.)

Defendants contend that their proffered evidence is relevant not just to their duress defenses, but also to challenging the Government's case that they acted with the requisite intent to defraud or mislead, or were willfully blind as to the law(s).  (Oz's Mem. in Supp. at 9–10; McConnell's Resp. in Supp. at 5–6.)  Defendants also argue that there are few, if any, issues with hearsay.  First, they contend that the evidence is not being offered for the truth of what it asserts, but rather to show the Defendants' state of mind (i.e., the reasonableness of their fear of Le Roux and their lack of intent to defraud or be willfully blind to the law).  See supra n.1.  Second, at least some of this evidence will be introduced through or corroborated by the statements of Le Roux and Hunter themselves. See id.

The Court will not issue a sweeping pretrial exclusion of Defendants' duress evidence.  The Defendants have presented compelling arguments that at least some of this evidence is relevant and admissible.  See United States v. Posada-Rios, 158 F.3d 832, 875 (5th Cir. 1998) (upholding district court's decision to deny giving the jury a duress instruction, but allowing the defendant to present argue duress-related evidence because it went to the element of intent); see also Dixon v. United States, 548 U.S. 1, 7 (2006) (explaining that although a duress defense and the mens rea element of the underlying crime are closely related, they are distinct legal inquiries).  At trial, the Government is

free to challenge the admissibility of specific pieces of evidence and the Court will rule

on those objections then.

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT**:

1. The Government's Motion in Limine to Exclude Evidence of Duress and Evidence Relating to Paul Le Roux [Doc. No. 690] is **DENIED**.  However, the Government is free to make admissibility objections to the duress evidence during trial and argue that the jury should not be instructed as to a duress defense at the close of evidence.

Dated: February 3, 2017                                   s/ Susan Richard Nelson
                                                          SUSAN RICHARD NELSON
                                                          United States District Judge